Jerome ANDERSON, Petitioner,

v.

SUPERINTENDENT, ELMIRA CORRECTIONAL FACILITY and Commissioner, New York State Department of Correctional Services, Respondents.

No. 03–CV–1750(FB).

United States District Court, E.D. New York.

March 14, 2005.

Malvina Nathanson, Esq., New York City, for Petitioner.

Charles J. Hynes, Esq., District Attorney, Kings County by Monique Ferrell, Esq., Assistant District Attorney, Brooklyn, NY, for Respondents.

---

## MEMORANDUM & ORDER

`BLOCK, District Judge.

Petitioner Jerome Anderson ("Anderson") seeks a writ of *habeas corpus* pursuant to 28 U.S.C. § 2254. Anderson was convicted after trial by jury in the Supreme Court, Kings County, for committing three robberies and one attempted robbery of fast food restaurants in Brooklyn between June 10 and June 15, 1998. He raises three bases for *habeas* relief: 1) he was deprived of due process because the trial court ruled after the close of the evidence that under *People v. Molineux,* 168 N.Y. 264, 61 N.E. 286 (1901), the jury could consider evidence of one of the crimes charged as probative of his guilt of the others;[1] 2) he was also deprived of due process when the prosecutor showed his arrest photograph to a witness during the trial to facilitate her in-court identification of Anderson; and 3) his equal protection rights under *Batson v. Kentucky,* 476 U.S. 79, 106 S.Ct. 1712, 90 L.Ed.2d 69 (1986), were violated. For the reasons set forth below, Anderson's petition is denied; however, the Court grants a certificate of appealability on the *Batson* claim.

## BACKGROUND

### 1. Jury Selection

No record was kept as to the number or racial composition of the potential jurors who were called into the courtroom for jury selection; however, the trial court maintained a Challenge Record, a form used by the judge to track the race and gender of each prospective juror called to be seated in the jury box, excused for cause, or excused by a peremptory challenge by the prosecutor or defendant's counsel. *See* Resp't's Brief on Direct Appeal, Ex. A ("Challenge Record"). The

---

1. *Molineux* established the standards in New York for determining the admissibility of evidence of prior bad acts committed by a defendant.

following facts are gleaned from the Challenge Record and the transcript of the jury selection proceeding.

Jury selection began on November 15, 1999. It was conducted in rounds by placing sixteen prospective jurors by random selection in the jury box in each round. It took three rounds to select the twelve jurors, plus two alternates. By operation of law, each side had fifteen peremptory challenges for the selection of the twelve jurors, and two peremptories for the selection of the two alternates. *See* N.Y.Crim. Pro. Law § 270.25(2)(b).

The first round contained five African–Americans, three Hispanics and eight Whites. One African–American and one White were excused for cause, leaving four African–Americans, three Hispanics, and seven Whites subject to peremptory challenges. The judge required the parties to initially consider the first twelve prospective jurors and then, if need be, the remaining two. *See* Selection Tr. at 133–34.[2] The prosecutor challenged two African–Americans, one Hispanic and one White; Anderson challenged one Hispanic and five Whites. The remaining four were seated: two African–Americans, one Hispanic and one White. Eight remained to be selected. Figure One graphically displays the outcome of the first round.

**Figure One: Round One**

| Race | Potential Jurors | Excused for Cause | Peremptory Challenges by Prosecution | Peremptory Challenges by Defendant | Jurors Seated |
|---|---|---|---|---|---|
| African–American | 5 | 1 | 2 | 0 | 2 |
| Hispanic | 3 | 0 | 1 | 1 | 1 |
| White | 8 | 1 | 1 | 5 | 1 |
| TOTAL | 16 | 2 | 4 | 6 | 4 |

The second round consisted of six African–Americans, one Asian–American, two Hispanics and seven Whites. Again, one African–American and one White were excused for cause. Since eight more jurors had to be selected, the judge required that the first eight remaining prospective jurors first be subject to peremptory challenges, then, if necessary, the next four, and finally the remaining two. *See id.* at 216–18. The prosecutor challenged three African–Americans and one Hispanic; Anderson challenged one African–American, one Asian–American, one Hispanic, and one White. The remaining African–American and five Whites were then seated. Figure Two depicts the outcome of the second round.

**Figure Two: Round Two**

| Race | Potential Jurors | Excused for Cause | Peremptory Challenges by Prosecution | Peremptory Challenges by Defendant | Jurors Seated |
|---|---|---|---|---|---|
| African–American | 6 | 1 | 3 | 1 | 1 |

2. "Selection Tr." refers to the Jury Selection transcript.

| | | | | | |
|---|---|---|---|---|---|
| Asian–American | 1 | 0 | 0 | 1 | 0 |
| Hispanic | 2 | 0 | 1 | 1 | 0 |
| White | 7 | 1 | 0 | 1 | 5 |
| TOTAL | 16 | 2 | 4 | 4 | 6 |

The composition of the jury selected thus far was three African–Americans, one Hispanic, and six Whites; two remained to be selected. The third round consisted of eight African–Americans, one Asian–American, three Hispanics, and four Whites. None were excused for cause. Since two jurors were to be selected, the judge permitted the parties to first exercise peremptories against the first two prospective jurors; thereafter, if necessary, they would proceed against those remaining on an individual basis in the order in which they were seated in the jury box. See id. at 303–04.

The first twelve prospective jurors were challenged as follows: The prosecutor used six of her seven remaining peremptories to challenge five African–Americans and one Asian–American, leaving her with one peremptory; Anderson used all his remaining five peremptories to challenge one African–American, one Hispanic and three Whites. At this point, one juror, an African–American, had been selected. The total composition of the jury selected thus far was four African–Americans, one Hispanic and six Whites, requiring one more juror and the two alternates to be selected. There remained one African–American, two Hispanics and one White, in that order.

Anderson's counsel then raised a Batson challenge, asserting that the prosecutor's peremptory challenges were directed against African–Americans on account of their race. See id. at 306 ("I would raise a Batson objection at this time. It appears that the prosecutor's challenges are directed primarily against Black individuals, and in many of those cases there is no apparent non-racial reason for the challenge."). He then requested time to "tally up the precise numbers of challenges against the others[,]" id. at 306–07; the prosecutor countered with "a reciprocal Batson challenge[,]" id. at 307, informing the court that she "will be tallying up defense counsel's peremptory challenges on the basis of race," id.; and the court then recessed for the day. See id. at 308.

Figure Three represents the outcome of the third round at the time that the parties raised their Batson challenges.

**Figure Three: Round Three—At Time of *Batson* Challenges**

| Race | Potential Jurors | Excused for Cause | Peremptory Challenges by Prosecution | Peremptory Challenges by Defendant | Jurors Seated |
|---|---|---|---|---|---|
| African–American | 7 | 0 | 5 | 1 | 1 |
| Asian–American | 1 | 0 | 1 | 0 | 0 |
| Hispanic | 1 | 0 | 0 | 1 | 0 |
| White | 3 | 0 | 0 | 3 | 0 |
| TOTAL | 12 | 0 | 6 | 5 | 1 |

The next morning, the court, after noting that it had recessed the prior day before it had the opportunity to hear the *Batson* challenges, first afforded defense counsel "an opportunity to state" his challenge. *Id.* at 309. In support of his claim, Anderson's counsel told the court that the prosecutor had used nine of fourteen peremptory challenges to strike African–Americans. *See id.* at 310. He also commented that the prosecutor's peremptory challenges resulted in the striking of nine of thirteen African–Americans who had not been excused for cause, *see id.;* however, as shown by the Challenge Record, as of that time, of the eighteen African–Americans who had been called from the venire, sixteen had been eligible for peremptory challenges (two having been dismissed for cause); therefore, the correct number was nine of sixteen. *See* Challenge Record.

Anderson's counsel "believe[d]" that those two sets of statistics "establishe[d] a prima facie case." Selection Tr. at 310. He did not set forth the percentage of African–Americans comprising the 48 members of the venire, although this was then easily ascertainable; of the 48, nineteen (including the two who were excused for cause and the one remaining in this last round) were African–Americans (40%). He did, however, immediately thereafter identify by name three African–American jurors from "the latest current round of jury selection," believing that "the record reveals no articulable non-racial reason for the peremptory challenge," and requested that the court seat "at least one of those jurors over the People's objection." *Id.* at 310–11. The judge did not respond to the request; rather, he asked Anderson's counsel whether "that complete[d] your presentation." *Id.* at 311. He answered in the affirmative. *See id.*

The judge then explained to Anderson's counsel that "you are required, as the person asserting the [prima facie *Batson*] claim, to show that there exists facts and other relevant circumstances sufficient to raise an inference that the prosecution used its peremptory challenges to exclude potential jurors because of their race," *id.* at 312, and ruled as follows:

> Looking back at the—what occurred prior to the challenge, the record should indicate that we were in the third round of jury selection at the time the Batson issue was raised. Defense counsel had already used all 15 of his challenges. And one Black male, the only person selected on the third round, again, was Black. The Court also notes that the make-up of the jury at that point was six Whites, one Hispanic and four blacks. While that in and of itself is not dispositive, I do not believe that based on the circumstances developed by you that that constitutes a showing of a prima facie case.

*Id.*

The prosecutor agreed, and then stated: "There are several peremptories that we used that were not on the basis of race at all, and for those we have articulable reasons for exercising those peremptories." *Id.* at 313. Neither defense counsel nor the judge asked the prosecutor to explain or clarify this statement; nor did either assert that the statement could be construed as an implicit admission of a *Batson* violation. The prosecutor further commented that "as your Honor noted, the jury make-up as a whole is pretty much down the line a cross-section of the community, six Whites, one Hispanic and four Blacks," and also asked the court "to note that in each round an African–American juror was chosen—more than one African–American juror was chosen." *Id.* The judge then commented that "[o]ne other

thing that I failed to mention was that, according to my notes, the gentleman in seat number eight was a Black male, who was found acceptable by the prosecution, but challenged by the defense." *Id.* at 313–14.

Next, in response to defense counsel's contrary contention, the Court commented that the racial composition of the jury is "not dispositive, but it's certainly something to look at." *Id.* at 315. Anderson's counsel then stated:

> The factors which the courts have indicated are most significant in determining whether the prima facie step one showing has been made are the proportion of the particular race as a proportion of the total challenges and as a proportion—and the challenges as a propo[r]tion of jurors available.

*Id.* at 316.

The judge did not respond; instead, he then allowed the prosecutor to articulate the basis for her reverse *Batson* challenge; she pointed out that "nine of the 15 challenges exercised [by defense counsel] were against White[s,]" *id.* at 317; the judge denied the challenges, and concluded the *Batson* proceeding by stating that "there's no need to proceed any further at this point." *Id.* at 318. The *Batson* issue was not thereafter revisited by either party or the trial court.

After the judge denied the *Batson* challenges, the remaining African–American was the next to be passed upon. The prosecutor did not use her last peremptory challenge, and he was seated as the twelfth juror.

The parties then endeavored to select the two alternates from the three who remained—two Hispanics and one White. The prosecutor challenged one of the Hispanics; the remaining Hispanic was select-ed as the first alternate. Anderson's counsel then challenged the White. The parties then agreed that the second alternate would be an African–American whom the prosecutor had previously peremptorily challenged. *See id.* at 322. Thus, the final composition of the twelve-member jury was five African–Americans, one Hispanic and six Whites; the alternates were one African–American and one Hispanic.

### 2. Relevant Aspects of the Trial

At trial, the prosecution called an employee of a McDonald's that Anderson was charged with robbing on June 15, 1998. She had previously identified Anderson both in a photo array on June 23, 1998, and from a lineup in November 1998. However, at trial, when asked whether she saw the perpetrator of one of the robberies in the courtroom, the witness answered, "I don't know." Tr. at 337.[3] The witness then volunteered, upon further reflection, that she did recognize Anderson from the lineup, but noted that he had "gotten a little bit bigger." *Id.* at 339.

Over defense counsel's objection, the judge permitted the prosecutor to show the witness Anderson's arrest photo "to establish the defendant's appearance [at] . . . the time and date of the robbery." *Id.* at 355–56. The witness then identified Anderson as the robber. *See id.* at 362.

After both sides had rested, the judge held a charging conference, during which Anderson's counsel asked the judge to instruct the jurors that they must consider each charge separately based solely on evidence applicable to that charge, and that they could not consider evidence of guilt on one charge as evidence of guilt on any other charge. *See id.* at 615. The prosecution objected, stating that she in-

---

**3.** "Tr." refers to the trial transcript.

tended to argue in summation that the similarities between the crimes demonstrated that they were committed by the same person. *See id.* at 621. Anderson's counsel countered that it was "too late now after all the evidence is in for [the prosecution] first to urge that *Molineux* considerations should permit the jury to consider evidence of one crime as probative of the defendant's guilt on the other cases." *Id.* at 633. The judge determined that the crimes followed the same *modus operandi* and, thus, could be considered by the jury under *Molineux*. *See id.* The prosecution argued during summation that all the charged crimes were committed by the same person. *See, e.g., id.* at 679.

Anderson was convicted on all counts. He was sentenced to consecutive terms of ten years for each of the three robbery counts and seven years on the attempted robbery count, for an aggregate of thirty-seven years.

### 3. Post–Trial Proceedings

On appeal, Anderson raised, *inter alia,* all claims presently before the Court. The Appellate Division affirmed the judgment of conviction. *See People v. Anderson,* 294 A.D.2d 511, 742 N.Y.S.2d 850 (2d Dep't 2002). It rejected the *Batson* claim, commenting:

> The defendant failed to articulate on the record a sound factual basis for his *Batson* claim. In the absence of a record demonstrating sufficient facts or circumstances supporting a prima facie case of purposeful discrimination, the [trial court] correctly determined that the defendant failed to establish a pattern of purposeful exclusion sufficient to raise an inference of racial discrimination.

*Id.* In respect to the other claims that Anderson raises in his *habeas* petition, the Appellate Division summarily stated that they were "either unpreserved or without

merit." *Id.* After Anderson unsuccessfully sought leave to appeal to the Court of Appeals, *see People v. Anderson,* 98 N.Y.2d 708, 749 N.Y.S.2d 5, 778 N.E.2d 556 (2002), he timely filed his *habeas* petition.

### DISCUSSION

### 1. Standard of Review

■ Pursuant to the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"), when a federal claim has been "adjudicated on the merits" by a state court, the state court's judgement is entitled to substantial deference. *See* 28 U.S.C. § 2254(d). "[A] state court adjudicates a state prisoner's federal claim on the merits when it (1) disposes of the claim on the merits, and (2) reduces its disposition to judgment." *Sellan v. Kuhlman,* 261 F.3d 303, 312 (2d Cir.2001) (citations and quotations omitted).

■ *Habeas* relief may not be granted under AEDPA for claims "adjudicated on the merits" unless the state court decision 1) was "contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States," or 2) was "based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." 28 U.S.C. § 2254(d). A state court decision is "contrary to" clearly established federal law "if the state court applies a rule that contradicts the governing law set forth" in Supreme Court precedent or "if the state court confronts a set of facts that are materially indistinguishable from a decision of [the Supreme Court] and nevertheless arrives" at a different conclusion. *Williams v. Taylor,* 529 U.S. 362, 405–06, 120 S.Ct. 1495, 146 L.Ed.2d 389 (2000). A state court decision involves an "unreasonable application" of clearly established fed-

eral law if it unreasonably applies Supreme Court precedent to the particular facts of a case. *See id.* at 409, 120 S.Ct. 1495. This inquiry requires a court to "ask whether the state court's application of clearly established federal law was objectively unreasonable," not whether the application was erroneous or incorrect. *Id.* In that respect, the standard to be applied "falls somewhere between merely erroneous and unreasonable to all reasonable jurists." *Wade v. Mantello,* 333 F.3d 51, 57 (2d Cir.2003) (quoting *Jones v. Stinson,* 229 F.3d 112, 119 (2d Cir.2000)). However, the "increment [of incorrectness beyond error] need not be great; otherwise, habeas relief would be limited to state court decisions so far off the mark as to suggest judicial incompetence." *Eze v. Senkowski,* 321 F.3d 110, 125 (2d Cir.2003) (quoting *Francis S. v. Stone,* 221 F.3d 100, 111 (2d Cir.2000)).

Regarding the "unreasonable application" prong, the Supreme Court has recently explained:

the range of reasonable judgment can depend in part on the nature of the relevant rule. If a legal rule is specific, the range may be narrow. Applications of the rule may be plainly correct or incorrect. Other rules are more general, and their meaning must emerge in application over the course of time. Applying a general standard to a specific case can demand a substantial element of judgment. As a result, evaluating whether a rule application was unreasonable requires considering the rule's specificity. The more general the rule, the more leeway courts have in reaching outcomes in case by case determinations.

*Yarborough v. Alvarado,* 541 U.S. 652, 124 S.Ct. 2140, 2149, 158 L.Ed.2d 938 (2004).

■ Where the state court holds that a claim is "unpreserved *and* without merit,"

it is not preserved for federal *habeas* review if the state court correctly determined that it was unpreserved. *See Fama v. Commissioner of Corr. Services,* 235 F.3d 804, 811 n. 4 (2d Cir.2000) ("[W]here a state court says that a claim is 'not preserved for appellate review' and then ruled 'in any event' on the merits, such a claim is not preserved."); *Kanani v. Phillips,* 2004 WL 2296128, at *23 n. 35 (S.D.N.Y. Oct. 13, 2004) (collecting cases). Where, however, the state court rules that a claim is "either unpreserved for appellate review *or* without merit," the level of deference to be afforded to the state court is "anything but clear." *Su v. Filion,* 335 F.3d 119, 126 (2d Cir.2003). As the Second Circuit explained in *Su:*

[The court has] granted AEDPA deference to a state court that had used the language that a particular claim was "either unpreserved for appellate review or without merit[,]" ... because the record showed that the petitioner had preserved the disputed claim at every stage, thereby indicating that the Appellate Division had not denied that claim because it was unpreserved. Conversely, [the court] ha[s] also held that where a state court's ruling does not make clear whether a claim was rejected for procedural or substantive reasons and where the record does not otherwise preclude the possibility that the claim was denied on procedural grounds, AEDPA deference is not given, because [the court] cannot say that the state court's decision was on the merits.... [The court's] cases seem to contemplate situations in which, because of uncertainty as to what the state courts have held, no procedural bar exists and yet no AEDPA deference is required.

*Id.* at 126 n. 3. *See also Robinson v. Ricks,* 2004 WL 1638171, at *8 n. 8 (E.D.N.Y. July 22, 2004) (reviewing a claim that the

state court held was "either unpreserved or without merit": "The notion that a state court determination might get neither the 'procedural default' deference nor the 'adjudication on the merits' deference because its decision could rest both on a default and on the merits strikes [the court] as anomalous. However, because [petitioner's] claim . . . fails even under a de novo standard of review, [the court] need not address this issue." (citing *Su*, 335 F.3d at 126 n. 3)).

In ruling on Anderson's *Molineux* and identification claims, the Appellate Division stated only that they were "either unpreserved for appellate review *or* without merit." *Anderson*, 294 A.D.2d at 511, 742 N.Y.S.2d 850 (emphasis added). As in *Robinson*, the Court need not grapple with the unsettled issue of whether AEDPA deference is implicated since it determines that these claims do not survive *de novo* review.

As for the *Batson* claim, which was unequivocally adjudicated on the merits, it is to be evaluated under the "unreasonable application" prong, *see Overton v. Newton*, 295 F.3d 270, 277 (2002) ("the district court's grant of the *habeas* remedy to Overton is proper only if the state court determination that there was no *prima facie* showing under *Batson* involved an unreasonable application of Supreme Court precedent"); the dispositive question, therefore, "is whether it was 'objectively unreasonable' for the Appellate Division to determine that [Anderson] failed to make a prima facie showing of race-based purpose before the state trial court." *Harris v. Kuhlmann*, 346 F.3d 330, 344 (2d Cir.2003).

## 2. *Molineux* Ruling

■ Anderson contends that he was denied due process because the trial court did not make its *Molineux* ruling until after both sides had rested. Anderson construes this evidentiary ruling as a violation of his constitutional due process right because he did not have prior notice that a *Molineux* ruling would be sought and an opportunity to defend against this ruling during the trial.

In support of his argument, Anderson cites *Lankford v. Idaho*, 500 U.S. 110, 111 S.Ct. 1723, 114 L.Ed.2d 173 (1991), a case he argues is strikingly similar "in concept." Pet'r's Mem. of Law at 7. In *Lankford*, a judge sentenced the defendant to death despite a complete absence of any discussion of the death penalty at the sentencing hearing. *Lankford*, 500 U.S. at 116–17, 111 S.Ct. 1723. The Supreme Court stated that "[n]otice of issues to be resolved by the adversary process is a fundamental characteristic of fair procedure," *id.* at 126, 111 S.Ct. 1723, and that the lack of notice to defense counsel that the court was contemplating a death sentence violated due process.

■ Reliance on *Lankford* misses the mark. Here, the trial judge's ruling was an evidentiary ruling on an issue of state law. Such a ruling warrants habeas relief "only where the petitioner can show that the error deprived him of a fundamentally fair trial." *Zarvela v. Artuz*, 364 F.3d 415, 418 (2d Cir.2004); *see also Estelle v. McGuire*, 502 U.S. 62, 67–68, 112 S.Ct. 475, 116 L.Ed.2d 385 (1991) ("[F]ederal habeas corpus relief does not lie for errors of state law[.]"). Unlike the grave situation in *Lankford*, the *Molineux* issue in this case simply did not rise to that level; there were no additional facts that Anderson could have adduced to counter the impact of the ruling since the crimes to which the *Molineux* ruling attached were the very same crimes for which he was being prosecuted. Indeed, Anderson does not contend that the *Molineux* ruling was incorrect, and does not specify how he

would otherwise have defended against these charges. In any event, in light of the overwhelming evidence of Anderson's guilt, any arguable error was harmless, even under *de novo* review. *See Zappulla v. People of New York,* 391 F.3d 462, 466 (2d Cir.2004) ("Prior to the enactment of [AEDPA], the Supreme Court held ... that, on collateral review of a state conviction, an error is harmless if it did not have a substantial and injurious effect or influence in determining the jury's verdict." (citation and quotations omitted)).

### 3. The In–Court Identification

■ Anderson's second claim likewise lacks merit. Although there is an abundance of federal precedent on the issue of suggestive identification procedures, virtually all of those cases concern pre-trial rather than in-court identifications. "Few cases ... have addressed whether circumstances surrounding an in-court identification can be impermissibly suggestive." *Bond v. Walker,* 68 F.Supp.2d 287, 298 (S.D.N.Y.1999). In this case, the witness had previously identified Anderson in both a photo array and a lineup, and her inability to do so at trial appears to have been caused by a substantial change in Anderson's appearance. While Anderson attacks the strength of the witness's pretrial identifications, he does not contend that those identifications were impermissibly suggestive.

■ The underlying principle regarding identification procedures is that "when the degree of unreliability leads to a very substantial likelihood of irreparable misidentification, the tainted testimony must be excluded to preserve the defendant's due process rights." *Kennaugh v. Miller,* 289 F.3d 36, 43 (2d Cir.2002) (citing *Manson v. Brathwaite,* 432 U.S. 98, 116, 97 S.Ct. 2243, 53 L.Ed.2d 140 (1977)). Given that the witness had just testified that she had

picked out Anderson in two previous identification procedures and that her inability to identify him at trial appeared to have been caused by a substantial change in his appearance, showing her a photograph of what Anderson looked like at the time of his arrest cannot be said to have created such a likelihood.

### 4. The *Batson* Challenge

#### a. The General Standard

As has often been explained, *Batson* established a three-step framework to ascertain whether a peremptory challenge was race-based. *Harris* is the Second Circuit's most recent articulation of this framework:

First, the moving party—i.e., the party challenging the other party's attempted peremptory strike—must make a prima facie case that the nonmoving party's peremptory is based on race. Second, the nonmoving party must assert a race-neutral reason for the peremptory challenge.... Finally, the court must determine whether the moving party carried the burden of showing by a preponderance of the evidence that the peremptory challenge at issue was based on race.

*Harris,* 346 F.3d at 343 (citation omitted).

Since the trial court ruled that the defendant had not made out a *prima facie* case, it did not require the prosecutor to assert race-neutral reasons for striking the African–Americans.

As explained in *Overton:*

To establish a *prima facie* case under *Batson,* a defendant must show that the circumstances surrounding the peremptory challenges raise an inference of discrimination. Specifically, ... [i]n deciding whether the defendant has made the requisite [*prima facie* ] showing, the trial court should consider all relevant circumstances. For example, a "pattern" of strikes against black jurors included

in the particular venire might give rise to an inference of discrimination. Similarly, the prosecutor's questions and statements during *voir dire* examination and in exercising his challenges may support or refute an inference of discriminatory purpose.

*Overton*, 295 F.3d at 277–78 (citing *Batson*, 476 U.S. at 96–97, 106 S.Ct. 1712).

The Second Circuit has discerned that "[c]ourts have used a . . . multi-factor analysis in analyzing prima facie showings under *Batson*," requiring them to "look to the totality of the circumstances." *Harris*, 346 F.3d at 345 (citations omitted). It has also described the *prima facie* burden to be "minimal . . . similar to that placed on plaintiffs in Title VII and equal protection jurisprudence." *Overton*, 295 F.3d at 279 n. 10.

### b. The *Batson* Record

Although not raised by the parties, the Court must evaluate whether the *Batson* challenge was sufficiently developed in light of the Second Circuit's recent decision in *Overton*, a § 2254 *habeas* subject to AEDPA review. There, by the end of the second round, when the *Batson* challenge was raised, 70 percent of Blacks (seven of ten) were challenged, including all five Blacks in that round (at that point, four jurors plus two alternates remained to be selected); moreover, this amounted to more than twice the thirty-four percent of Blacks comprising the thirty-two venirepersons whose races were known. *See Overton v. Newton*, 146 F.Supp.2d 267, 271–72 (E.D.N.Y.2001), *rev'd*, *Overton*, 295 F.3d at 279. Nonetheless, the circuit court reversed this Court's grant of *habeas*, holding that it was not an unreasonable application of *Batson* under AEDPA for the trial court to deny the challenge at that stage because jury selection had not been completed and the petitioner had not

"established on the record" the number of Blacks who had been seated and when the peremptories were exercised. *Overton*, 295 F.3d at 279. As it explained:

> In so holding, we express no view of what we might have concluded if petitioner, who bore the burden of articulating and developing the factual and legal grounds supporting his *Batson* challenge before the trial court, had renewed his claim once jury selection was completed or even when the record was fully established. Because this was not done, the trial judge never confronted, and the trial record does not reveal, what the statistics would have shown at the conclusion of jury selection. If those statistics sufficiently established the inference that challenges were based on race, the court could then have implemented the *Batson* process to ensure that impermissible challenges would not be allowed. If, on the other hand, the statistics at the conclusion failed to support a sufficient inference, there would be no need to engage in the process. We cannot say, on this record, that the trial judge's refusal to implement *Batson's* process was an unreasonable application of the *Batson* requirements.

*Id.*

The posture of the *Batson* record in the present case differs from *Overton* in a number of respects. Unlike *Overton*, a contemporaneous record of the challenges was made by the trial judge in his Challenge Record, which identified the race of each prospective juror drawn from the venire, as well as the party exercising each challenge; and the *Batson* challenge was raised in the last round, when only one more juror (plus the two alternates) had to be selected. Moreover, unlike *Overton*, the racial composition of the entire venire

of 48 from which all the jurors were selected was known.[4]

Nonetheless, although the record was sufficiently developed at the time the *Batson* challenge was raised and, as hereafter explained, the challenge was meritorious, the Court concludes that *habeas* relief is not warranted under AEDPA review because of the failure of defendant's counsel to properly articulate the facts and circumstances in support of defendant's *prima facie* burden.

### c. The Relevant Circumstances

■ Addressing the merits, the Court believes that four circumstances are relevant under *Batson* in this case: (1) the statistical percentage of African–Americans struck by the prosecutor compared to the African–Americans comprising the venire; (2) the composition of the jury; (3) the pattern of the strikes; (4) the statement of the prosecutor that "several peremptories ... were not on the basis of race...."[5]

### i. The Relative Statistics

In *Overton* the circuit court, although not reaching the *Batson* merits, nonetheless opined that "statistics, alone and without more, can, in appropriate circumstances, be sufficient to establish the requisite *prima facie* showing under *Batson*." 295 F.3d at 278. It did not explain what

it meant by "appropriate circumstances," but cited in a footnote to two prior Second Circuit cases, *United States v. Alvarado*, 923 F.2d 253 (2d Cir.1991) (*Alvarado II*) and *United States v. Diaz*, 176 F.3d 52 (2d Cir.1999), and three cases from other circuit courts. *See Overton*, 295 F.3d at 278 n. 9. In respect to *Alvarado II*, which was on direct appeal and predated AEDPA, the circuit court quoted from that part of the decision stating that "in connection with the assessment of a *prima facie* case ... statistical disparities are to be examined." *Id.* (quoting *Alvarado II*, 923 F.2d at 256). As for *Diaz*, also on direct review, and not the subject of AEDPA review, the court cited it immediately following its quotation from *Alvarado*, with a pinpoint citation, but without comment. *See id.* (citing *Diaz*, 176 F.3d at 77).

As for the three out-of-circuit cases, the first was cited for the proposition that "[a]n inference of discrimination based on the number of jurors of a particular race may arise when there is a substantial disparity between the percentage of jurors of one race struck and the percentage of their representation on the jury[,]" *id.* (quoting *Cent. Ala. Fair Hous. Ctr. v. Lowder Realty*, 236 F.3d 629, 637 (11th Cir.2000)); the second for its holding "that a *prima facie* case [was] established when

---

**4.** At the time of the *Batson* challenge, the four remaining members of the venire of 48, from whom the last juror was to be selected, plus the two alternates, were sitting in the jury box; consequently, their race, as well as the order in which they were seated, was known: as previously noted, the first was the last African–American; the others were two Hispanics and one White.

**5.** The Court presumes that Anderson is an African–American; however, the record does not disclose his race; nor does it disclose the race of the victims. Accordingly, the Court has not considered the race of the defendant

or his victims as additional circumstances. *See Brinson v. Vaughn*, 398 F.3d 225, 2005 WL 287450, at *7 (3d Cir.2005) (In evaluating whether a defendant has established a *prima facie* case of racial discrimination under *Batson*, "the race of a victim, the witnesses, and the defendant may be relevant because these facts may have a bearing on a prosecutor's motivation to use racially based strikes in a particular case[.]") (citing *United States v. Clemons*, 843 F.2d 741, 747 (3d Cir.1988)). In light of the Court's decision, these factors are here irrelevant.

the government used fifty-six percent of its peremptory challenges against African–Americans, but African–Americans comprised thirty percent of the venire population," *id.* (citing *Turner v. Marshall,* 63 F.3d 807, 813 (9th Cir.1995), *overruled on other grounds by Tolbert v. Page,* 182 F.3d 677 (9th Cir.1999) (en banc)); and the third as holding "that a *prima facie* case was made where minorities comprised twenty percent of the venire, but the prosecutor's exclusion rate was seventy-five percent." *Id.* (citing *Jones v. Ryan,* 987 F.2d 960, 971 (3d Cir.1993)).

In *Alvarado II,* "the prosecution's challenge rate against minorities was 50 percent (three of six) in the selection of the jury of 12, and 57 percent (four of seven) in the selection of the jury of 12 plus alternates." 923 F.2d at 255. The court reasoned that "[o]nly a rate of minority challenges significantly higher than the minority percentage of the venire would support a statistical inference of discrimination." *Id.* Since the minority percentage of the venire was unknown, the court, on its own initiative, accepted as a surrogate for that figure, the 29 percent minority percentage of the Eastern District of New York, from which the venire was drawn, and concluded that "a challenge rate nearly twice the likely minority percentage of the venire strongly supports a *prima facie* case under *Batson*"; consequently, it reached the second prong of the *Batson* inquiry and vacated the district court's judgment because the magistrate presiding over jury selection failed to make findings as to whether the prosecutor had offered race-neutral explanations in re-

spect to two of the challenged minorities.[6] *See id.* at 256.

By contrast, in *Diaz,* where the jury, as in the present case, was selected from a 48–person venire, 23 percent were minorities—eight African–Americans and three Hispanics. *See* 176 F.3d at 76. The government used 25 percent of its peremptory strikes against the African–Americans.[7] *See id.* The final minority composition of the 16–member jury (including four alternates), was 44 percent, consisting of five African–Americans and two Hispanics. *See id.* at 77. In rejecting the *prima facie Batson* challenge, the circuit court agreed with the district court's finding "that there was no statistical inference of racial discrimination because the government's 25 percent rate of minority strikes was not significantly higher than the 23 percent minority population of the venire." *Id.* at 77 (citation omitted). Furthermore, the circuit court agreed with the district court that the percentage of minorities from the relevant geographic area from which the jury was selected of sixteen percent (as found by the district court) also undermined the *Batson* claim when compared to the 44 percent minority composition of the jury. *See id.* ("Moreover, we find that the minority composition of 44 percent on the final jury as compared to the minority composition of 16 percent in the relevant area of Connecticut also undermines Zapata's claim that the government's peremptory strikes raise an inference of discrimination.").

More recently, in *Harris,* the Second Circuit granted a § 2254 *habeas* petition under AEDPA's unreasonable-application

---

6. The circuit court remanded to allow the magistrate to make such findings and to make "an ultimate determination on the issue of discriminatory intent based on all the facts and circumstances." *Alvarado II,* 923 F.2d at 256.

7. Although the defendant was Latino, the defense apparently could only present a colorable *Batson* claim by challenging the strikes against the African–Americans and arguing, in effect, that the prosecution was discriminating against all minorities.

prong where the prosecutor ultimately peremptorily challenged all of the five prospective black jurors, even though one had been initially accepted by the prosecutor. *See Harris*, 346 F.3d at 346 ("The fact that the prosecutor in this case was initially willing to accept one black juror is not sufficient to exempt from scrutiny the prosecutor's later decisions to strike all four of the remaining black potential jurors."). The court did not pause to consider the percentage that the black jurors bore to the entire venire, obviously believing that the wholesale rejection by the prosecution of all the blacks sufficed to satisfy the defendant's *prima facie* burden. In that respect, its decision was in keeping with its prior decision in *Tankleff v. Senkowski*, 135 F.3d 235 (2d Cir.1998), where the striking of all three blacks made out the requisite *prima facie* showing.

In the present case, since, unlike *Harris* and *Tankleff*, the prosecutor did not strike all the African–Americans, the Court compares the percentage of African–Americans struck to the percentage of African–Americans on the venire in order to assess whether the "rate of minority challenges [was] significantly higher than the minority percentage of the venire." *Alvarado II*,

923 F.2d at 255.[8] In making this assessment, the Court is informed by the Second Circuit's footnote citation in *Overton* to the Ninth Circuit's decision in *Turner* as an example of a *prima facie* disparity; there, in using 56 percent of its peremptory challenges against African–Americans where the African–Americans comprised 30 percent of the venire, the disparity was 26 percent. In the present case, where African–Americans comprised 40 percent of the venire (nineteen of 48) and 64 percent were struck at the time of the *Batson* challenge (nine of fourteen), the disparity was a comparable 24 percent. This is a circumstance, therefore, that supports petitioner's *prima facie* challenge.

ii. **The Composition of the Jury**

Counterbalancing this circumstance is that the final composition of the jury of twelve, with five African–Americans, was the same 40 percent of African–Americans comprising the venire, and the total percentage of African–Americans on the full jury, with an African–American being one of the two alternates, was even higher, at 42 percent (six out of fourteen). Although, as the Supreme Court made clear in *Alva-*

---

**8.** Unlike *Alvarado II*, the racial composition of the venire is known. *See Alvarado II*, 923 F.2d at 255–56 ("We are not informed of the minority percentage of the venire in this case, but we may accept as a surrogate for that figure the minority percentage of the population of the Eastern District, from which the venire was drawn."). Notably, prior to *Alvarado II*, the Second Circuit had stated that the "pertinent comparison is between the jury as selected and the racial or ethnic composition of the population of the judicial district, not the composition of the venire drawn for the particular case[,]" because "[t]he latter might contain an underrepresentation of a cognizable group compared to the pertinent population." *United States v. Biaggi*, 909 F.2d 662, 679 (2d Cir.1990). Since *Alvarado II*, the Second Circuit in *Diaz* compared the rate of strikes against minorities to both the "minori-

ty population of the venire" and the "minority composition ... in the relevant area of Connecticut." *Diaz*, 176 F.3d at 77. The Court believes, therefore, that the composition of the venire drawn for the case is a relevant factor. As a matter of curiosity, the Court *sua sponte*, as in *Alvarado II*, ascertained the Black population of the relevant area: In 2000, the percentage in Kings County was 38%. *See* U.S. Census Bureau, Race and Hispanic or Latino: 2000 (New York—County), at http://factfinder.census.gov (last visited Mar. 9, 2005). This is comparable to the 40% African–American population on the venire in the courtroom in the present case. While this additional statistic could probably be considered under *de novo* review, as in *Alvarado II*, the Court does not believe that it would be appropriate to consider it under AEDPA review.

*rado I,* the final composition of the jury can never alone satisfy the *Batson* inquiry, *see Alvarado v. United States,* 497 U.S. 543, 544, 110 S.Ct. 2995, 111 L.Ed.2d 439 (1990) ("*Alvarado I* ") ("[T]he Court of Appeals erred in holding that as long as the petit jury chosen satisfied the Sixth Amendment's fair-cross-section concept, it need not inquire into the claim that the prosecution had stricken jurors on purely racial grounds."), the Second Circuit has since considered the composition of the jury to be at least a factor in its *prima facie* determinations. *See Biaggi,* 909 F.2d at 679 ("The composition of the jury may be relevant to rebutting a claim of discrimination in the trial court[.]" (citation omitted)); *Diaz,* 176 F.3d at 77 (comparing the minority composition of the geographic area from which the jurors were chosen to the minority composition of the final jury). Other circuit courts have done likewise. *See, e.g., United States v. Beverly,* 369 F.3d 516, 527 (6th Cir.2004) ("[T]he district court has the responsibility to assess the prosecutor's credibility under all of the pertinent circumstances, including the final make-up of the jury."); *McCain v. Gramley,* 96 F.3d 288, 292 (7th Cir.1996) ("Courts must look to the totality of the circumstances, including the final make-up of the jury . . . ." (citation omitted)); *United States v. Joe,* 928 F.2d 99, 103 (4th Cir.1991) ("The composition of the jury may be considered as part of the total relevant circumstances upon which a determination of discrimination in jury selection is made, but it is not dispositive of that issue." (citation omitted)).

The Third Circuit, however, has recently taken a more circumspect view in holding that a defendant was not required to satisfy state caselaw that required presenting statistics regarding the ultimate composition of the jury, explaining:

> The final composition of the jury (or even the composition of the jury at the time the *Batson* objection is raised) offers *no* reliable indication of whether the prosecutor intentionally discriminated in excluding a member of the defendant's race. Indeed, the composition of a jury is decided by many factors, including the defendant's use of peremptory challenges, challenges for cause, and jurors' claims of hardship. Thus, a *Batson* inquiry focuses on whether or not racial discrimination exists in the striking of a black person from the jury, not on the fact that other blacks may remain on the jury panel.

*Holloway v. Horn,* 355 F.3d 707, 728–29 (3d Cir.2004) (internal citations and quotations omitted) (emphasis added). As the Third Circuit had previously explained, "[s]triking a single black juror could constitute a prima facie case even when blacks ultimately sit on the panel and even when valid reasons exist for striking other blacks." *Clemons,* 843 F.2d at 747 (citation omitted).

Those circuits that have considered the composition of the jury, including the Second Circuit, have struck a similar cautionary note. *See Harris,* 346 F.3d at 346 (quoting the above language in *Clemons* ). Although recognizing that the fact that five black jurors were seated was entitled to substantial consideration, the Fourth Circuit in *Joe* concluded that this did not preclude finding that black defendants had established a *prima facie Batson* challenge. *See Joe,* 928 F.2d at 103. And in *United States v. Moore,* where, as in the present case, the proportion of blacks on the jury was the same as in the venire, the Eighth Circuit "recognize[d] that it is the exclusion of blacks and not their inclusion (i.e., the final number) that is vital to a prima facie case of discrimination." 895 F.2d 484, 487 n. 5 (8th Cir.1990); *see also Lancaster v. Adams,* 324 F.3d 423, 434 n. 2 (6th Cir.2003) ("[T]his Court and our sister

circuits have held that the presence of one or more African–American venire members on the jury, standing alone, does nothing to preclude a valid claim under *Batson*." (citations omitted)); *United States v. Battle,* 836 F.2d 1084, 1086 (8th Cir.1987) ("[W]e emphasize that under *Batson,* the striking of a single black juror for racial reasons violates the equal protection clause, even though other black jurors are seated, and even when there are valid reasons for the striking of some blacks jurors." (citations omitted)).

The reliability of the final composition of African–Americans on the jury in the present case, although a factor to be considered under Second Circuit caselaw, is compromised in a number of respects. First, the African–American composition of the jury was significantly affected by defense counsel striking nine of eighteen prospective White jurors.[9] Second, that the prosecutor chose not to strike the last African–American, or that the parties agreed to seat an African–American previously struck by the prosecutor as an alternate, is hardly probative of whether the prosecutor's strikes at the time the *Batson* challenge was raised were race-based. *See Alvarado II,* 923 F.2d at 256 (prosecutor's fifth-round waiver did not defeat the *prima facie* case: "The discrimination condemned by *Batson* need not be as extensive as numerically possible. A prosecutor may not avoid the *Batson* obligation to provide race-neutral explanations for what appears to be a statistically significant pattern of racial peremptory challenges simply by forgoing the opportunity to use all

of his challenges against minorities."); *see also Reyes v. Greiner,* 340 F.Supp.2d 245, 266 (E.D.N.Y.2004) ("[I]t is settled law that a *Batson* violation occurs where the prosecution or the defendant has been found to have struck a single juror on the basis of race, even where the prosecution or the defendant waived peremptory challenges, leaving other persons of that race on the jury." (citations omitted)). Finally, what is particularly probative in the present case, and further undermines the significance of the composition of African–Americans on the jury, was the prosecutor's pattern of strikes, to which the Court now turns.

### iii.  The Pattern of Strikes

As aptly stated by the Seventh Circuit in *McCain,* a pattern of strikes "is more likely demonstrated by the *manner* in which a party uses its strikes as compared to its total strikes or to the total number of members of the racial group." 96 F.3d at 291–92 (emphasis added).

In the present case, in the first round, after one African–American had been excused for cause, the prosecutor struck two of the remaining four (50%). Realistically, the prosecutor would have been hard-pressed to have justified striking all four. The second round produced another plethora of African–Americans, and after one was excused for cause, the prosecutor struck three of the remaining five (60%). Going into the third round, the prosecutor had seven challenges left; three African–Americans had been seated—two more jurors and the two alternates had to be

9.  Petitioner's counsel candidly acknowledged at oral argument that "the defense lawyer also violated Batson[,]" and that "[t]he only reason that the jury had as many blacks as it did, is because you had the defense lawyer playing the same game." Oral Argument Tr. at 17 (Jan. 30, 2004). Nonetheless, as recently stated by the Third Circuit: "[E]ven if the defense itself violated equal protection by striking a potential juror based on race, this would not justify further constitutional violations by the prosecution. On the contrary, both the defense and prosecution strikes would be illegitimate." *Brinson,* 398 F.3d 225, 232.

selected. At the time the *Batson* challenge was raised, the prosecutor had used six of her seven challenges, striking the one Asian–American and five of the seven African–Americans (70%). After the *Batson* challenge, the prosecutor waived her last challenge, choosing not to strike the last African–American, thereby avoiding the prospect of providing further support for the challenge.

This pattern of African–American strikes takes on heightened significance when compared to the pattern of strikes by the prosecutor against Whites. At the time the *Batson* challenge was raised, the prosecutor had struck only one of the eighteen Whites who had been called from the venire—one of eight in the first round; none of seven in the second round, and none of the three in the third round. When the pattern of African–American strikes is contrasted with the virtual absence of any White strikes, it is readily apparent that the prosecutor's intent was to control the number of African–Americans on the jury, and the pattern of her strikes suggests that she was bent on, and succeeded in, avoiding the selection of a jury where the African–Americans would be the majority.

The Court, therefore, views the prosecutor's pattern of African–American strikes, especially when contrasted with the prosecutor's acceptance of seventeen of the eighteen Whites, to be the most compelling of all the circumstances in assessing whether her strikes were race motivated. Indeed, it provides a startling insight into the prosecutor's race-based mindset, especially when considered in conjunction with her rather remarkable statement to the judge that "[t]here are several peremptories that we used that were not on the basis of race at all, and for those we have articulable reasons for exercising those peremptories." Selection Tr. at 313.

#### iv. The Prosecutor's Statement

Regarding this statement, the respondent argues that "[t]he prosecutor obviously intended to convey nothing more or less than that she challenged potential jurors of different races, and that there were race-neutral reasons for her challenges against African–Americans[,]" Resp't's Mem. of Law at 20, and cautions against a contrary interpretation because neither the defense counsel nor the judge responded to this remark. Although it may well be that the prosecutor's statement was more of a Freudian slip, supportive of the race-based motive evidenced by her pattern of strikes, than an innocuous unfortunate choice of words, it was incumbent on defense counsel to have pressed the judge into action. *See Galarza v. Keane*, 252 F.3d 630, 643 (2d Cir.2001) (Walker, C.J., dissenting) ("A few choice words from [defense] counsel, who properly should bear responsibility for this debacle, would have saved years of direct and collateral review by avoiding this problem altogether."); *United States v. Perez*, 35 F.3d 632, 637 (1st Cir.1994) ("[I]f defense counsel felt that the trial court had failed to actually assess the prosecutor's credibility or had made a precipitous or erroneous judgment, it should have pointed this out."). The failure to do so undercuts the significance of the statement, although, under the circumstances of this case, it would seem to have a place under the totality of the circumstances.

#### d. AEDPA Analysis

If the Court were reviewing this record *de novo*, *habeas* relief would surely be warranted. After all, only a minimal showing need be made to satisfy the *prima facie* burden, and the congruence of the statistical disparity of the percentage of strikes of African–Americans compared to the percentage of African–Americans

comprising the venire, coupled with the pattern of strikes and the prosecutor's statement, certainly satisfies a minimalist standard; however, review of the merits must be made under the unreasonable-application prong of AEDPA.

The Court's research has disclosed that despite the minimal showing needed to satisfy the *prima facie* burden, the circuit courts, including the Second Circuit, have only twice granted *habeas* challenges under the unreasonable-application prong of AEDPA to a trial court's failure to implement the first prong of *Batson*—both under the most egregious of circumstances. *See Harris,* 346 F.3d at 346 (using peremptories against all five blacks); *Brinson,* 398 F.3d 225, 232 (using thirteen of fourteen peremptories against African–Americans). *Compare, e.g., Overton,* 295 F.3d at 279 (denying *habeas* when prosecutor struck seven of ten qualified Blacks in the first two rounds, including all five Blacks in the second round). Moreover, as Chief Judge Korman's recent meticulous research has revealed, "despite the frequency with which *Batson* claims are litigated on habeas, it appears that no decision of the Second Circuit to date has resulted in a new trial for a petitioner who challenged his state conviction on *Batson* grounds." *Reyes,* 340 F.Supp.2d at 276 (citations omitted).

The reluctance of the courts to grant *Batson habeas* relief, even under the minimal-burden standard governing a *prima facie* challenge, is presumably the by-product of the fact that *Batson* violations are held to be "structural errors" that automatically entitle a petitioner to such relief. *See Tankleff,* 135 F.3d at 248.[10] Nonetheless, even under the restrictive view of AEDPA's unreasonable-application standard reflected by the circuit courts' reluctance to grant *habeas* for violation of *Batson's* first prong except in the rarest of cases, the Court believes the present case qualifies on the merits, essentially because the pattern of African–American strikes compared to the pattern of White strikes is so stark.

However, in making its AEDPA determination, the Court is ultimately influenced by the failure of defense counsel to articulate all the relevant facts and circumstances in support of the *Batson* challenge—as this Court now has—when raised before the trial court, even though the judge gave him ample opportunity to do so. *Cf. Jordan v. Lefevre,* 206 F.3d 196, 201 (2d Cir.2000) (reversing denial of *Batson* challenge where trial judge "ruled summarily on the *Batson* application after an extremely brief colloquy, and resisted counsel's efforts to make arguments regarding the peremptory strikes so as to create a full record."). *Batson* not only

---

10. In his provocative decision in *Reyes,* Chief Judge Korman presents compelling arguments challenging the correctness of the automatic reversal rule. As he concluded:

The overwhelming majority of non-frivolous *Batson* claims dealt with by habeas courts involve sloppiness on the trial judge's part, rather than "system-tainting" racial discrimination. Where a petitioner alleges only that the trial judge tripped up in some way in navigating the procedural steps necessary to resolve petitioner's *Batson* motion, as distinct from a claim that the trial judge permitted the prosecutor to exclude a prospective juror on the basis of race, and the error is one of the innocent mistakes that will inevitably be made in any system that processes large numbers of cases in good faith, there is no good reason why a federal habeas court should apply an automatic reversal rule, or further prolong the proceeding by remanding for a reconstruction hearing that is subject to the usual risks of imprecision and distortion from the passage of time.

*Reyes,* 340 F.Supp.2d at 277 (internal citations and quotations omitted).

sets the substantive standard for the requisite *prima facie* case, it also constitutes clearly established Supreme Court precedent for placing the burden of supporting the *prima facie* challenge on the party raising it. *See Overton,* 295 F.3d at 279 ("[P]etitioner ... bore the burden of articulating and developing the factual and legal grounds supporting his *Batson* challenge before the trial court...."). Thus, the trial judge was correct in basing his decision "on the circumstances developed by [the defense counsel]." Selection Tr. at 312. These circumstances consisted of the percentage of the prosecutor's strikes against African–Americans, the claim that the prosecutor summarily struck three African–Americans in the last round, and defense counsel's argument that, in addition to "the proportion of the particular race as a proportion of the total challenges[,]" another relevant factor that "the courts have indicated" is "the proportion of the particular race ... as a propo[r]tion of jurors available." *Id.* at 316.

However, Anderson's defense counsel failed to explain that the percentage of strikes was 24% greater than the percentage of African–Americans comprising the venire, or point out the radical difference between the pattern of the prosecutor's strikes against Whites compared to the strikes against the African–Americans. Counsel also did not elaborate on the circumstances regarding the three jurors struck by the prosecutor during the last round who he claimed were struck because of their race, and did not ask the prosecutor to explain the meaning of her statement that several of her peremptories "were not on the basis of race."

On the record articulated by defense counsel, the Court cannot conclude that

the Appellate Division's determination that "[t]he defendant failed to articulate on the record a sound factual basis for his *Batson* claim[,]" *Anderson,* 294 A.D.2d at 511, 742 N.Y.S.2d 850, even though there was a meritorious basis for the claim, was an unreasonable application of Supreme Court precedent.

■ The Court will grant a Certificate of Appealability; Anderson has made a "substantial showing of the denial of a constitutional right" pursuant to 28 U.S.C. § 2253(c)(2) because the question of whether he has sufficiently articulated a *prima facie* case under *Batson* is "adequate to deserve encouragement to proceed further." *See Lucidore v. New York State Div. of Parole,* 209 F.3d 107, 112 (2d Cir.2000) ( [A] "substantial showing" does not compel a petitioner to demonstrate that he would prevail on the merits, but merely ... that the questions are adequate to deserve encouragement to proceed further. (citations and quotations omitted; alterations in original)).

## CONCLUSION

Anderson's petition is denied. A certificate of appealability is granted solely on the issue of whether the state court's determination that a *prima facie* case of a *Batson* violation had not been established was an unreasonable application of clearly established Supreme Court law.[11]

**SO ORDERED.**

---

11. Since the Court is granting a Certificate of Appealability, it would be useful to district courts reviewing *Batson* claims on *habeas* review if the circuit court would clarify, in light of *Overton,* whether, or under what circumstances, a *prima facie Batson* challenge must

be renewed after jury selection has been completed. *Compare Overton,* 295 F.3d at 279 (expressing no view of what the court's decision would have been if defendant "had renewed his claim once jury selection was completed or even when the record was fully established."), *with Biaggi,* 909 F.2d at 679

("*Batson* objections should be entertained and adjudicated during the process of jury selection.... [T]he prosecutor's unwarranted exclusion of cognizable groups should be remedied on the spot, without waiting to see the ultimate composition of the jury." (internal citations and quotations omitted)).