George OVERTON, Petitioner–Appellee,

v.

James NEWTON, Superintendent of the Watertown Correctional Facility, Respondent–Appellant.

Docket No. 01–2436.

United States Court of Appeals, Second Circuit.

Argued: Jan. 31, 2002.

Decided: July 09, 2002.

Ian Rosenberg, Cahill, Gordon & Reindel, New York, NY, for Petitioner–Appellee.

Beth J. Thomas, Assistant Attorney General, New York, NY, for Eliot Spitzer, Attorney General of the State of New York (Michael S. Belohlavek, Deputy Solicitor General, and Robin A. Forshaw, Assistant Solicitor General, of counsel), for Respondent–Appellant.

Before LEVAL and CALABRESI, Circuit Judges, and STEIN,[*] District Judge.

CALABRESI, Circuit Judge.

Respondent–Appellant James Newton, Superintendent of the Watertown Correctional Facility, appeals from an order entered on June 13, 2001 in the United States District Court for the Eastern District of New York (Block, *J.*) granting Petitioner–Appellee George Overton's petition for a writ of *habeas corpus*. *Overton v. Newton*, 146 F.Supp.2d 267 (E.D.N.Y. 2001). Following the affirmance of his state court conviction, *People v. Overton*, 238 A.D.2d 528, 657 N.Y.S.2d 192 (App. Div., 2d Dep't 1997), *leave to appeal denied*, 90 N.Y.2d 908, 663 N.Y.S.2d 520, 686 N.E.2d 232 (1997), petitioner sought a writ of *habeas corpus* on the grounds that his rights under *Batson v. Kentucky*, 476 U.S. 79, 106 S.Ct. 1712, 90 L.Ed.2d 69 (1986), were violated.[1] The district court concluded that *habeas* relief was warranted. We reverse.

## BACKGROUND

Overton, who is African–American, was convicted, along with co-defendant Sonia Pegram,[2] by a jury in Queens County Su-

---

[*] The Honorable Sidney H. Stein, United States District Judge for the Southern District of New York, sitting by designation.

1. Petitioner also asserted a claim that his rights under the Confrontation Clause had been violated. The district court, however, rejected that claim as meritless, *Overton v. Newton*, 146 F.Supp.2d 267, 279–80 (E.D.N.Y.

2001), and the issue is not raised in this appeal.

2. Pegram did not raise a *Batson* claim in her direct appeal. *See People v. Pegram*, 233 A.D.2d 468, 650 N.Y.S.2d 591 (App. Div., 2d Dep't 1996), *leave to appeal denied*, 89 N.Y.2d 988, 656 N.Y.S.2d 746, 678 N.E.2d 1362 (1997). She plays no part in this appeal.

preme Court (Dunlop, *J.*) on February 1, 1995 for the criminal sale of a controlled substance in the third degree, in violation of N.Y. Penal Law § 220.39[1], criminal possession of a controlled substance in the third degree, in violation of N.Y. Penal Law § 220.16[1], and criminal possession of a controlled substance in the seventh degree, in violation of N.Y. Penal Law § 220.03. Overton was sentenced to a six to twelve-year term of imprisonment and, at the time of the district court's order, had been on parole for over two years. Overton's term of parole would, in ordinary course, expire in 2010.

During jury selection, the trial court employed a modified jury box system. Peremptory challenges were to be exercised in rounds. The prosecutor was entitled to fifteen peremptory challenges, *see* N.Y.Crim. Proc. Law § 270.25(2)(b), as were the defendants, collectively. Each side had an additional two peremptory challenges to be used in the selection of alternate jurors. Sixteen prospective jurors were called from the venire[3] for the first round. Two of the sixteen were struck for cause, the prosecutor exercised four peremptory challenges, and the defendants used five. Accordingly, five jurors were seated following the first round. Another sixteen prospective jurors were called from the venire for the second round. Three were dismissed for cause, the prosecutor exercised six peremptory challenges, and the defendants used four. Thus, at the end of the second round, three additional jurors were seated. At this point in the jury selection process, "no contemporaneous record [had been] made

of the races of either the challenged jurors or those seated." *Overton,* 146 F.Supp.2d at 271.

Following the end of the second round, Overton's counsel raised a *Batson* challenge, claiming that, by her "rough count," the prosecutor had used seven of nine peremptory challenges against African–American prospective jurors.[4] Petitioner's counsel then said, "I think that shows a clear *prima facie* showing," and asked the court to "make sure that challenges were properly exercised." In response, the prosecutor stated that petitioner's challenge was "frivolous" because three of the then-eight selected jurors were African–American and also because the prosecutor had exercised one of his peremptory challenges to exclude a white potential juror. The prosecutor also made a "reverse-*Batson* motion" to the trial court, alleging that the defense had used every one of its nine peremptory challenges to strike white jurors. After allowing no further discussion, the trial court ruled: "I find [that] neither one of you have [sic] made out a *prima facie* case of purpose[ful] discrimination."

The trial court then proceeded to the third round of jury selection, at which point only four prospective jurors remained from the original venire. Two jurors were chosen in the third round, and again no contemporaneous record was made of the racial backgrounds of the prospective jurors. Following the third round, but before concluding proceedings for the day, the trial judge identified the racial backgrounds of the thirty-two members of the first two panels. It also noted

3. "Venire," as the term was employed by the trial court and the parties "refers to the total number of potential jurors present in the courtroom after those individuals claiming that jury service would impose a hardship or believed that they held a bias had been excused." *Overton,* 146 F.Supp.2d at 270 n. 4.

4. The prosecutor had in fact exercised ten, rather than nine, peremptory challenges by the end of the second round.

which jurors had been seated, which had been excused for cause, and which had been stricken by peremptory challenge. The trial judge explained that she had postponed making a record "so that we could let the prospective jurors get on their way." The state court's findings, as described by the district court below, were as follows:

In the first round, the prosecutor used his four challenges to strike two of five blacks. Therefore, of the five jurors seated in the first round, three were black. In the second round, six blacks were put in the box; one was struck for cause. The prosecutor then used five of his six challenges to strike all of the remaining black potential jurors. In sum, the prosecutor used his ten peremptory challenges to strike seventy percent (7 out of 10) of the qualified blacks in the first two rounds, including all five qualified blacks in the second round.

*Overton,* 146 F.Supp.2d at 271.

The next day of the proceedings, jury selection was completed. The last two jurors, in addition to two alternates, were selected from a panel of sixteen prospective jurors drawn from a fresh venire. *Id.* The record is incomplete as to the racial backgrounds of the jurors selected in the fourth round or of the members of the venire for the third and fourth rounds. *Id.* at 271–72. Significantly, the defendants did not renew their *Batson* challenges either when the record was made or at the end of jury selection.

On direct appeal to the New York appellate courts, Overton raised *Batson* and Confrontation Clause claims. The Appellate Division, Second Department, rejected the *Batson* challenge, stating that "[c]ontrary to the defendant's contention, the record does not demonstrate that a *Batson* violation occurred during jury selection." *Overton,* 657 N.Y.S.2d at 193. Elaborating, the court noted that Overton's reliance "solely upon the number of peremptory challenges made by the prosecutor against black venirepersons" failed "to make out the requisite *prima facie* showing" required by *Batson. Id.* The Appellate Division also rejected Overton's Confrontation Clause claim. Leave to appeal to the New York Court of Appeals was denied. *Overton,* 90 N.Y.2d at 908, 663 N.Y.S.2d 520, 686 N.E.2d 232.

In due course, Overton filed *pro se* a petition for a writ of *habeas corpus* in federal court. *Pro bono* counsel was appointed pursuant to an order of the district court. And, on June 13, 2001, that court granted Overton's petition, holding that "the trial court's determination that the petitioner's *Batson* challenge did not rise to the level of a *prima facie* inference of discrimination was an unreasonable application of clearly established Supreme Court law to the facts." *Overton,* 146 F.Supp.2d at 279. Citing our decision in *United States v. Alvarado,* 923 F.2d 253, 255–56 (2d Cir.1991) (hereinafter *Alvarado II* ) (holding that, where the rate of minority challenges is significantly higher than the minority percentage of the venire, there is a statistical inference of discrimination sufficient to meet the requisite *prima facie* showing under *Batson* ), the court noted that "a finding in the present case of a *prima facie* showing of discrimination squares with the Second Circuit's statistical precedents." *Overton,* 146 F.Supp.2d at 276. The court observed that, as in *Alvarado II,*[5] the prosecutor's

---

**5.** In *Alvarado II,* the prosecutor challenged fifty percent of the minorities (three out of six) in the selection of the jury of twelve, and fifty-

seven percent (four of seven) in the selection of the jury of twelve plus alternates. *See Alvarado II,* 923 F.2d at 255. Because the

"challenges against blacks (7 out of 10) . . . was statistically more than twice the thirty-four percent of blacks comprising the thirty-two venirepersons whose races were known (11 out of 32)." *Id.* at 276.

Having found that *habeas* relief was warranted, the district court ordered that "[t]he indictment shall be dismissed unless a new trial is commenced within sixty days of the date of entry of this order." *Id.* at 280. On August 1, 2001, respondent sought an order from the district court staying the grant of the writ. Respondent's motion was denied on August 15, 2001 and, on that date, the district court ordered that Overton be released from parole and that the underlying indictment against him be dismissed. This appeal followed.

## DISCUSSION

### I. *Habeas Review of Petitioner's* Batson *Claim*

#### A. *Standard of Review*

■ We review a district court's ruling on a petition for a writ of *habeas corpus de novo*. *Galarza v. Keane*, 252 F.3d 630, 635 (2d Cir.2001); *Mask v. McGinnis*, 252 F.3d 85, 88 (2d Cir.2001) (per curiam); *English v. Artuz*, 164 F.3d 105, 108 (2d Cir.1998). Pursuant to 28 U.S.C. § 2254, as amended by the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"), Pub.L. No. 104–132, 110 Stat. 1214, *habeas* relief may not be granted with respect to a claim that was adjudicated on the merits in state court proceedings unless the adjudication resulted in a decision (1) that was "contrary to, or involved an unreasonable application of, clearly estab-

lished Federal law, as determined by the Supreme Court of the United States," or (2) that was "based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." 28 U.S.C. § 2254(d) (1994). A state court determination of a factual issue is, moreover, presumed to be correct, *id.* § 2254(e)(1), and is unreasonable only where the petitioner meets the burden of "rebutting the presumption of correctness by clear and convincing evidence." *Id.*

■■ In *Williams v. Taylor*, 529 U.S. 362, 120 S.Ct. 1495, 146 L.Ed.2d 389 (2000), the Supreme Court interpreted § 2254(d)(1) as giving independent meanings to the "contrary to" and "unreasonable application" clauses. *Id.* at 404, 120 S.Ct. 1495. A state court decision is "contrary to" clearly established federal law as determined by the Supreme Court "if the state court arrives at a conclusion opposite to that reached by [the Supreme Court] on a question of law or if the state court decides a case differently than [the Supreme Court] has on a set of materially indistinguishable facts." *Id.* at 413, 120 S.Ct. 1495. A state court decision involves an "unreasonable application" of Supreme Court precedent if it "identifies the correct governing legal principle from [the Supreme Court's] decisions but unreasonably applies that principle to the particular facts of [a] prisoner's case." *Id.*

#### B. *Clearly Established Federal Law: Batson v. Kentucky and Its Progeny*

■ The phrase "clearly established Federal law, as determined by the Supreme Court of the United States" refers to "the holdings, as opposed to the dicta, of

---

*Alvarado II* court did not know the minority percentage of the venire, it used the minority percentage of the population of the district (the Eastern District of New York) from which the venire was drawn, which was

twenty-nine percent. *Id.* at 256. It concluded that "a challenge rate nearly twice the likely minority percentage of the venire strongly supports a *prima facie* case under *Batson.*" *Id.*

[the Supreme] Court's decisions as of the time of the relevant state-court decision." *Id.* at 412, 120 S.Ct. 1495; *see also Francis S. v. Stone,* 221 F.3d 100, 108 (2d Cir.2000). The clearly established Supreme Court precedent applicable in this case is *Batson v. Kentucky,* in which the Court set forth a three-part test that trial courts are to employ in evaluating allegations of race-based exercise of peremptory challenges. *Batson,* 476 U.S. at 96–98, 106 S.Ct. 1712. First, a trial court must decide whether the party challenging the peremptory strike has made a *prima facie* showing that the circumstances give rise to an inference that a member of the venire was struck because of his or her race. Such a *prima facie* case may be established by, *inter alia,* showing a pattern of challenges against minority prospective jurors. *Id.* at 97, 106 S.Ct. 1712. Second, once a *prima facie* case is established, the trial court must require the non-moving party to proffer a race-neutral explanation for striking the potential juror. *Id.* This second step in the *Batson* inquiry does not mandate an explanation that is persuasive or even plausible. *Purkett v. Elem,* 514 U.S. 765, 768, 115 S.Ct. 1769, 131 L.Ed.2d 834 (1995). Finally, when the non-moving party has proffered a race-neutral explanation, the trial court must determine whether the moving party has carried his or her burden of proving that the strike had been motivated by purposeful discrimination.[6] *Batson,* 476 U.S. at 98, 106 S.Ct. 1712.

Specifically with respect to the first step of the inquiry, the *Batson* Court held that, in order to establish a *prima facie* case of discrimination, a defendant must show facts and circumstances that raise an inference that the prosecutor used the peremptory challenge to exclude potential jurors from the petit jury on account of their race.[7] *Id.* at 96, 106 S.Ct. 1712.

 We have stated that "the threshold decision concerning the existence of a *prima facie* case of discriminatory use of peremptory challenges involves both issues of fact and an issue of law." *United States v. Alvarado,* 891 F.2d 439, 443 (2d Cir. 1989), *vacated on other grounds,* 497 U.S. 543, 110 S.Ct. 2995, 111 L.Ed.2d 439 (1990) (hereinafter *Alvarado I* ); *see also Mahaffey v. Page,* 162 F.3d 481, 484 (7th Cir. 1998) ("[T]he preliminary question of whether a *prima facie* case has been shown presents a mixed question of law and fact."); *Tolbert v. Page,* 182 F.3d 677, 681 n. 6 (9th Cir.1999) ("The *prima facie* [*Batson* ] inquiry involves a mixed question of law and fact, because the court must determine whether the facts are sufficient to meet the requirements of the legal rule and, therefore, to proceed to the ensuing steps of the *Batson* analysis.").[8] This means that, once the fact-finding has been performed, "the judge must then determine, as a matter of law, whether these underlying facts suffice to establish a *pri-*

6. In the case before us, the trial court determined that the defendant had not made out a *prima facie* case and, thus, did not reach the second and third steps of the *Batson* analysis.

7. Originally, under *Batson,* the defendant needed to show in addition that he or she was a member of a "cognizable racial group" and that the prosecutor had exercised peremptory challenges against members of the defendant's race. These requirements were later eliminated in *Powers v. Ohio,* 499 U.S. 400, 111 S.Ct. 1364, 113 L.Ed.2d 411 (1991).

8. Some circuits, however, have held that, under the AEDPA, the existence of a *prima facie Batson* case involves only a determination of fact. *See, e.g., Weaver v. Bowersox,* 241 F.3d 1024, 1030 (8th Cir.2001) ("We have held that each of the three steps of the *Batson* inquiry involves a determination of fact."); *Soria v. Johnson,* 207 F.3d 232, 238 (5th Cir.2000) ("The state court's determination that Soria failed to make a *prima facie* showing is a factual finding.").

*ma facie* case." *Alvarado I*, 891 F.2d at 443.

■■■ On federal *habeas* review, mixed questions of law and fact translate to "mixed constitutional questions (*i.e.*, application of constitutional law to fact)," *Williams*, 529 U.S. at 400, 120 S.Ct. 1495 (O'Connor, *J.*, concurring). Under the AEDPA, they are subject to the standard set forth in 28 U.S.C. § 2254(d)(1), which requires the *habeas* court to determine whether the state court's decision "was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States." 28 U.S.C. § 2254(d)(1).

## C. Application of AEDPA's "Contrary To" and "Unreasonable Application" Clauses

■■ It is clear in this case that the state court's decision was not "contrary to" clearly established Supreme Court precedent. The state court identified the correct governing law with respect to Overton's *Batson* claim, and it did not, on a question of law, reach a conclusion opposite to that of the Supreme Court. And, the Supreme Court has not as yet decided a case that is on its facts materially indistinguishable from the instant case. Accordingly, the district court's grant of the *habeas* remedy to Overton is proper only if the state court determination that there was no *prima facie* showing under *Batson* involved an unreasonable application of Supreme Court precedent.

In *Williams*, the Court held that a state court decision fails the "unreasonable application" prong of AEDPA analysis, "if the state court identifies the correct governing legal principle from [the Supreme Court's] decisions but unreasonably applies that principle to the facts of the prisoner's case." *Williams*, 529 U.S. at

413, 120 S.Ct. 1495. The law, however, is not clearly defined on what it means for a state court to apply a principle unreasonably. And, as to this, there are two distinct areas of uncertainty.

First, as the Court has observed, "[t]he term 'unreasonable' is no doubt difficult to define." *Id.* at 410, 120 S.Ct. 1495. In doing so, it cautioned that "an *unreasonable* application of federal law is different from an *incorrect* or *erroneous* application of federal law." *Id.* at 412, 120 S.Ct. 1495 (emphasis in original). And we, interpreting *Williams*, have added that the standard to be applied "falls somewhere between merely erroneous and unreasonable to all reasonable jurists." *Jones v. Stinson*, 229 F.3d 112, 119 (2d Cir.2000) (citation and internal quotation marks omitted). "Some increment of incorrectness beyond error is required, ... the increment need not be great; otherwise *habeas* relief would be limited to state court decisions so far off the mark as to suggest judicial incompetence." *Id.* (citations and internal quotation marks omitted); *see Loliscio v. Goord*, 263 F.3d 178, 184 (2d Cir.2001); *Francis S.*, 221 F.3d at 111.

Second, there has been considerable uncertainty as to how broadly or narrowly lower courts should construe principles defined by the Supreme Court in order to determine whether state courts have applied them reasonably. It is this latter question that is at issue in the instant case.

## D. The Principle Established by Batson

■■■ To establish a *prima facie* case under *Batson*, a defendant must show that the circumstances surrounding the peremptory challenges raise an inference of discrimination. Specifically, the Supreme Court stated:

In deciding whether the defendant has made the requisite [*prima facie* ] show-

ing, the trial court should consider all relevant circumstances. For example, a "pattern" of strikes against black jurors included in the particular venire might give rise to an inference of discrimination. Similarly, the prosecutor's questions and statements during *voir dire* examination and in exercising his challenges may support or refute an inference of discriminatory purpose. These examples are merely illustrative.

*Batson,* 476 U.S. at 96–97, 106 S.Ct. 1712. Other than through these illustrative examples, the Court has not, to date, provided a more particularized view of what constitutes a *prima facie* showing of discrimination under *Batson.* Accordingly, respondent argues that, since the Supreme Court has never directly held that statistics, without more, can satisfy a defendant's *prima facie Batson* burden, the state court's ruling cannot be an unreasonable application of existing Supreme Court precedent. We disagree.

■■■ Respondent's argument fails because federal law, as determined by the Supreme Court, may as much be a generalized standard that must be followed, as a bright-line rule designed to effectuate such a standard in a particular context. *Kennaugh v. Miller,* 289 F.3d 36, 42 (2d Cir. 2002); *see Gilchrist v. O'Keefe,* 260 F.3d 87, 97 (2d Cir.2001), *cert. denied sub nom. Gilchrist v. Smith,* —— U.S. ——, 122 S.Ct. 1933, 152 L.Ed.2d 839 (2002); *Lainfiesta v. Artuz,* 253 F.3d 151, 154 (2d Cir.2001), *cert. denied sub nom. Lainfiesta v. Greiner,* —— U.S. ——, 122 S.Ct. 1611, 152

L.Ed.2d 625 (2002). In *Batson,* the Supreme Court made clear that a state's purposeful exclusion of jurors based on race violates the Equal Protection Clause of the U.S. Constitution. *Batson,* 476 U.S. at 84, 106 S.Ct. 1712. In subsequent cases, the Court has reaffirmed this statement and extended its application beyond race, while also explaining the underlying general antidiscrimination principle that it had established:

> Discrimination in jury selection, whether based on race or on gender, causes harm to the litigants, the community, and the individual jurors who are wrongfully excluded from participation in the judicial process. The litigants are harmed by the risk that the prejudice that motivated the discriminatory selection of the jury will infect the entire proceeding. The community is harmed by the State's participation in the perpetuation of invidious group stereotypes and the inevitable loss of confidence in our judicial system that state-sanctioned discrimination in the courtroom engenders.

*J.E.B. v. Alabama,* 511 U.S. 127, 140, 114 S.Ct. 1419, 128 L.Ed.2d 89 (1994) (citation omitted). As a result, *Batson* must be read as not only prohibiting certain specific actions, but also as creating a broad standard or principle that the courts must, in reason, follow.

■■■ In light of the foregoing, we have no doubt that statistics, alone and without more, can, in appropriate circumstances, be sufficient to establish the requisite *prima facie* showing under *Batson.*[9] And, we

---

9. In fact, in *Alvarado II,* we stated that *"Batson's* citation of *Castaneda v. Partida,* 430 U.S. 482, 97 S.Ct. 1272, 51 L.Ed.2d 498 (1977), in connection with the assessment of a *prima facie* case, indicates that statistical disparities are to be examined." *Alvarado II,* 923 F.2d at 256 (citation omitted); *see Alvarado I,* 891 F.2d at 444; *United States v. Diaz,* 176 F.3d 52, 77 (2d Cir.1999). Our position

in *Alvarado II* is supported by decisions of other circuits. *See, e.g., Cent. Ala. Fair Hous. Ctr. v. Lowder Realty,* 236 F.3d 629, 637 (11th Cir.2000) ("[A]n inference of discrimination based on the number of jurors of a particular race may arise when there is a substantial disparity between the percentage of jurors of one race struck and the percentage of their representation on the jury."); *Turner v. Mar-*

believe that to hold otherwise would undermine the general antidiscrimination principle established by *Batson*.[10] *Cf. Kennaugh*, 289 F.3d at 45 ("[A] state court determination is reviewable under AEDPA if the state decision unreasonably failed to extend a clearly established, Supreme Court defined, legal principle to situations in which that principle should have, in reason, governed." [11]). In the instant case, however, the state trial court need not be read to have made such a holding.

 Here, the prosecutor used four peremptory challenges in the first round of jury selection and struck two of five African–American potential jurors from the venire. Three African–American jurors were seated. In the second round, there were six African–American potential jurors in the box; one was struck for cause and the other five were excluded as a result of peremptory strikes by the prosecutor. At this point, before jury selection was completed and before the above facts were even fully established on the record, peti-

tioner made his *Batson* challenge. It was at this stage that the trial court denied it; we cannot say that, in doing this, it unreasonably applied the *Batson* principle.

In so holding, we express no view of what we might have concluded if petitioner, who bore the burden of articulating and developing the factual and legal grounds supporting his *Batson* challenge before the trial court, had renewed his claim once jury selection was completed or even when the record was fully established. Because this was not done, the trial judge never confronted, and the trial record does not reveal, what the statistics would have shown at the conclusion of jury selection. If those statistics sufficiently established the inference that challenges were based on race, the court could then have implemented the *Batson* process to ensure that impermissible challenges would not be allowed. If, on the other hand, the statistics at the conclusion failed to support a sufficient inference, there would be no need to

---

*shall*, 63 F.3d 807, 813 (9th Cir.1995) (stating that a *prima facie* case is established when the government used fifty-six percent of its peremptory challenges against African–Americans, but African–Americans comprised thirty percent of the venire population), *overruled on other grounds sub nom., Tolbert v. Page*, 182 F.3d 677 (9th Cir.1999) (en banc); *Jones v. Ryan*, 987 F.2d 960, 971 (3d Cir.1993) (holding that a *prima facie* case was made where minorities comprised twenty percent of the venire, but the prosecutor's exclusion rate was seventy-five percent). ·

10. It would also be inconsistent with the minimal burden put on a defendant to make a *prima facie* showing under *Batson*, a burden similar to that placed on plaintiffs in Title VII and equal protection jurisprudence. The familiar three-step evidentiary framework that the Supreme Court imported into the *Batson* context "is derived from the Supreme Court's equal protection and Title VII jurisprudence." *Evans v. Smith*, 220 F.3d 306, 312 (4th Cir. 2000) (citing *Batson*, 476 U.S. at 93–98, 106 S.Ct. 1712).

11. Our position in *Kennaugh* is in precise accord with the language of Justice Kennedy's opinion in *Ramdass v. Angelone*, 530 U.S. 156, 120 S.Ct. 2113, 147 L.Ed.2d 125 (2000) (in which the Chief Justice and Justices Scalia and Thomas concurred), which stated that a "state determination may be set aside under this standard if, under clearly established federal law, the state court was unreasonable in refusing to extend the governing legal principle to a context in which the principle should have controlled." *Id.* at 166 (plurality opinion). That opinion concluded that, in the circumstances of *Ramdass*, the state's failure to extend a prior Supreme Court ruling was not unreasonable. Four members of the Supreme Court (Justices Stevens, Souter, Ginsburg, and Breyer) dissented, and without discussing the extension issue, found the state's action directly contrary to a prior Supreme Court decision, and hence reversible. *Id.* at 207–08, 120 S.Ct. 2113 (Stevens, J., dissenting).

engage in the process. We cannot say, on this record, that the trial judge's refusal to implement *Batson's* process for testing each questioned challenge midway in the process was an unreasonable application of the *Batson* requirements.[12]

Accordingly, we find that there is no basis for *habeas corpus* relief and we vacate the district court's grant of the writ.[13]

### CONCLUSION

We hold that the state court's determination that petitioner had failed to make the requisite *prima facie* showing under *Batson* was not contrary to, nor an unreasonable application of, clearly established federal law as determined by the Supreme Court. The judgment of the district court is, therefore, REVERSED, and its grant of the writ of *habeas corpus* is VACATED.

---

12. Our ruling in this case is governed by the deferential standard prescribed by AEDPA for *habeas* review by a federal court of a state court determination. We, therefore, do not address the question that would arise if this were a direct appeal from a federal criminal trial on the same facts and make no suggestion as to how such a case should be decided.

13. Given our conclusion that there was no basis for *habeas corpus* relief, which results in the reversal of the district court's judgment granting the writ, we need not consider respondent's contention that the district court abused its discretion when it issued an order directing that the indictment against petitioner should be dismissed unless he was re-tried within sixty days.